IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE J. M. SMUCKER COMPANY, | ) CASE NO. 1:20-cv-3653 |
| Plaintiff, | ) |
|  | ) JUDGE |
| v. | ) |
|  | ) |
| TRADESHIFT, INC., | ) **PLAINTIFF'S COMPLAINT** |
|  | ) **AND JURY DEMAND** |
| Defendant. | ) |

## COMPLAINT

Plaintiff, The J. M. Smucker Company ("Smucker"), brings this Complaint against Defendant, Tradeshift, Inc. ("Tradeshift").

## NATURE OF THE CASE

1. Smucker brings this case to recover the significant damages it incurred as a result of the fraudulent inducement, fraudulent and/or negligent misrepresentations, and breaches of contract committed by Tradeshift concerning its capabilities to perform under a services agreement dated June 30, 2019 ("Services Agreement" or "Agreement")[1].

2. Smucker is a household name synonymous with the consumer-packaged goods that it and a network of suppliers make available across the nation. Given the number of suppliers, brands, and volume of products it provides, Smucker requires a comprehensive and attuned software system to manage its supply chain.

3. In 2019, Smucker began a rigorous search for a vendor that could provide operating systems and applications for its supply chain's procure-to-pay process. As part of the search, Smucker asked contending vendors to answer over 200 questions in response to a formal Request

---

[1] As the Agreement is marked "Confidential" it is not attached hereto but can be provided to the Court for an *in camera* review.

for Proposal ("RFP"), complete an extensive report addressing hundreds of unique business criteria and capabilities (the "Business Requirements Document" or "BRD"), and agree to an interview.

4. In response to Smucker's requests, Tradeshift submitted information about its business, capabilities, financial health, and experience that was replete with material misrepresentations. Among other things, Tradeshift falsely represented that it was uniquely qualified and able to satisfy hundreds of unique criteria listed in the Business Requirements Document.

5. Smucker, in reliance on Tradeshift's submissions and without knowledge of the material misrepresentations contained therein, selected Tradeshift over other companies to serve as its vendor, and, on June 30, 2019, the parties subsequently entered into the Services Agreement. After the parties entered into the Services Agreement, Smucker discovered that Tradeshift could not provide the services it contractually agreed to perform. Had Tradeshift launched its program for Smucker as its enterprise procure-to-pay solution, it would have been riddled with critical and fatal defects, which would have undoubtedly caused significant delays and disrupted communications with and payments from Smucker's suppliers.

6. If Smucker had known that Tradeshift materially misrepresented its ability to meet Smucker's stringent business requirements and its experience providing services to companies of similar size and scope, Smucker would not have selected Tradeshift as its vendor or entered into the Services Agreement.

7. Tradeshift was and remains incapable of satisfying Smucker's exacting, much less than basic, requirements it knew or reasonably should have known, that it could not perform.

8. As a direct result of Tradeshift's inability to perform its obligations under the Services Agreement, Smucker was forced to extend its contract with the existing software vendor to perform those services and hire a new vendor, both at additional cost and expense, all in addition

to the hundreds of thousands of dollars it paid Tradeshift under the Services Agreement.

9. As a direct result of Tradeshift's fraud, misrepresentations, and breach of contract, Smucker has been damaged, and through this action, seeks rescission of the Services Agreement, as well as compensatory damages and punitive damages, and the other relief requested herein.

## THE PARTIES

10. Smucker is an Ohio corporation with its principal place of business at One Strawberry Lane, Orrville, Ohio 44667.

11. Smucker is an iconic one hundred twenty-three year old American company that manufactures and sells scores of consumable products like jam, peanut butter, jelly, fruit syrups, beverages, shortening, ice cream toppings, cooking oils, coffee, pet food, and other products.

12. Tradeshift is a Delaware corporation with its principal place of business at 612 Howard Street, Suite 100, San Francisco, California 94105.

13. Tradeshift represents itself as a provider of a cloud-based network and platform to assist companies in digitizing the supply chain process.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states and the amount in controversy exceeds the sum or value of $75,000.

15. Venue is proper in this Court pursuant to Section 14 of the Services Agreement in which the parties agreed to the Southern District of New York as the exclusive venue for purposes of disputes pursuant to the Agreement.

## FACTS COMMON TO ALL COUNTS

**SMUCKER CONDUCTED DUE DILIGENCE IN SEARCH OF VENDORS THAT COULD MEET ITS EXACTING AND ABSOLUTE BUSINESS REQUIREMENTS**

16. In 2019, Smucker began the process of selecting a vendor that could electronically

manage its supply chain, including, but not limited to, supplier master data management, creating and revising purchase requisitions, creating and revising purchase orders ("PO"), entering goods receipts, invoice processing and reconciliation, and payments.

17. Smucker was specifically looking for a vendor to provide an operating system and application that would allow Smucker to perform these functions electronically while also limiting the manual intervention and handling of electronic data sources throughout the procure-to-pay process.

18. Smucker deals with hundreds of suppliers on a daily basis for the different facets of its business and requires a robust operating system and program tailored to meet its individual and unique business needs.

19. Smucker engaged in a rigorous vendor selection process to find a company that could provide the services it sought. It interviewed several vendors and required each to complete a written RFP response and an extensive Business Requirements Document.

20. The RFP alone requested answers to over 200 questions regarding the vendors' business and capabilities. The BRD sought detailed information about hundreds of requirements sought by Smucker, which were categorized as either "Want" or "Must Have." The BRD included over 180 "Must Have" requirements that vendors had to be able to perform in order to provide the services sought by Smucker.

21. The BRD clearly explained that a vendor's failure to deliver a "Must Have" requirement would result in complete project failure.

**TRADESHIFT MATERIALLY MISREPRESENTED ITS CAPABILITIES**

22. Tradeshift is one of the vendors that participated in Smucker's selection process, which included an interview and completing the RFP and BRD.

23. During its interactions with Smucker, Tradeshift made a number of material

4

representations regarding its qualifications and capabilities.

24. For example, in its March 2, 2019 submission in response to the RFP,[2] Tradeshift responded to hundreds of questions regarding its business and program capability and functionality which addressed, among other topics, catalog management, configuration, user interface, guided buying, purchase orders (including purchase order setup and collaboration), budgeting, receiving, invoicing, supplier information, system security and technology, general architecture, integration, error handling, data security, support, and implementation.

25. While every representation cannot be included in this Complaint, Smucker provides a sampling of some of the representations.

26. For example, Tradeshift represented that it had done "over 20 implementations over the past 24 months" for companies similar in size and complexity to Smucker.

27. Tradeshift also included many representations about how its product was superior to that of its competitors, stating "[o]ne of the key differentiators between Tradeshift and our competitors is our ability to onboard suppliers for electronic invoicing as well as take up a myriad of other opportunities on the Tradeshift network."

28. Tradeshift represented that its revenue was $300-$500 million in the preceding year.

29. Tradeshift represented and publicly disclosed that it received at least $250 million in Series E funding in May 2018. On May 15, 2019, Tradeshift emailed Smucker a presentation about its customers and funding that included this representation.

30. In regards to the questions about whether its software had certain capabilities, with minimal exceptions, the answers were unequivocally "Yes."

---

[2] Given the voluminous nature of the RFP, as well as the confidentiality of the submission, it is not attached hereto but can be provided to the Court for an *in camera* review.

31. Based on Tradeshift's response to all of the questions in the RFP, Smucker selected the company to participate as a final vendor in the selection process and asked it to complete the BRD. On June 14, 2019, Chris Todd of Tradeshift submitted a completed BRD that expressly represented that the company could fulfill most, if not all, of Smucker's "Want" and "Must Have" requirements.[3]

32. The scope of the representations is voluminous, and, as a result, they are not repeated in this Complaint, but are contained in the BRD itself.

33. There were roughly 250 requirements on the BRD, over 180 of which were listed by Smucker as "Must Have" requirements.

34. In other words, without these features the system would not work for Smucker.

35. Tradeshift not only represented that it could meet these requirements, but that the majority were available "out of the box." Thus, Tradeshift represented that its product was already designed to meet Smucker's "Want" and "Must Have" requirements.

36. Based on these representations, Smucker selected Tradeshift as its vendor.

37. A material consideration leading Smucker to select Tradeshift and enter into the Services Agreement was the numerous representations made by Tradeshift in its RFP and BRD submissions regarding the capability and functionality of its services platform.

38. As a result of Tradeshift's representations, the parties entered into the Services Agreement on June 30, 2019.

### THE PROJECT FAILED AS A RESULT OF NUMEROUS FATAL FLAWS

39. Shortly after the parties entered into the Services Agreement, the project experienced significant delays.

---

[3] Again, given the voluminous nature of the RFP, as well as the confidentiality of the submission, it is not attached hereto but can be provided to the Court for an *in camera* review.

40. The issues were so numerous that Smucker was forced to review with and/or provide a defects list to Tradeshift on a weekly, if not daily, basis.

41. In addition, it became necessary for the Smucker and Tradeshift project team to speak daily and project management weekly, in an attempt to address the myriad of problems and issues with the project.

42. Among the list of defects identified by Smucker were those identified as either being "fatal" or "critical" in nature.

43. "Critical defect" is defined on the Smucker defects list as "one that prevents the application from functioning and will delay go-live. This is a major flaw in the design that inhibits a 'Must Have' business requirement from being met and has no workaround."

44. "Fatal defect" is defined by that same document as a defect that "causes system level errors that prevent the test execution from continuing. For example, clicking on the 'Submit' button causes the application to crash. Fatal defects must be fixed immediately, so testing can continue."

45. Throughout this process, Smucker realized that Tradeshift misrepresented its software's capabilities in the RFP. For example, it represented that its system provided real-time integration with Oracle, which later proved to be false. It also represented its system could "hide" the overall value of a PO, which later proved to be false.

46. In addition, Smucker documented several instances in the BRD where Tradeshift misrepresented the functionality of its software.

47. Of those misrepresentations, several were included in the BRD as "Must Have" requirements that Tradeshift represented would be included in the program.

48. The following are examples of the "Must Have" requirements that Tradeshift represented its program could meet:

7

(a) the ability to have one to many supplier site relationships;

(b) the ability for a user to 'hide' the overall PO value on a PO communication to the supplier;

(c) the ability to integrate supplier master data from Oracle in an automated manner;

(d) the ability to setup various approval routing rules (at entry of invoice);

(e) the ability to setup reconciliation routing rules;

(f) the ability to customize the entry form;

(g) the ability for all master data to be real-time; and,

(h) the ability to enter a credit memo for returns.

49. Without these key "Must Have" requirements, Smucker's procure-to-pay process would not be able to handle a live production environment, as it would create stalled transactions, data inaccuracies, and a lack of proper audit controls.

50. Several of these "Must Have" requirements, including the ability to enter a credit memo for returns, were among the "out of the box" capabilities Tradeshift represented its program could deliver.

51. It eventually became apparent, and Tradeshift later admitted, that its program could not process credit memos or perform several of the other "Must Have" requirements identified by Smucker.

52. When confronted with the critical and/or fatal defects in its program, and the discrepancies between its representations and actual capabilities, including those that were supposedly "out of the box," Tradeshift merely offered to consider, but not commit to, addressing the issues in a future release of the program software.

53. In other words, when confronted with the fact of a critical and/or fatal defect, Tradeshift responded that it would consider an upgrade in the future.

54. It soon became apparent to Smucker that Tradeshift's program did not have the basic functionality needed to meet critical requirements and/or cure critical and/or fatal defects.

55. Tradeshift was aware of each of the defects and after weeks of attempts to cure, nothing had been fixed.

56. As late as January 6, 2020, the program still had several defects, some of which were critical, and others which were fatal, to the program.

57. Tradeshift's software did not meet Smucker's most basic functionality requirements, and Tradeshift was unable to perform its obligations under the Services Agreement.

58. And it also became apparent to Smucker that Tradeshift had not worked with 20 similar companies on similar projects, its revenue in 2018 was not $300-$500 million, its financial position was brittle despite claims of ample funding in May 2018, and its product was not superior to that of competitors and was woefully inadequate for the needs of Smucker.

## TRADESHIFT'S FRAUD VOIDED THE AGREEMENT

59. As it became apparent that Tradeshift could no longer perform under the Services Agreement, and that it had materially misrepresented the capabilities and functionality of its product, Smucker was forced to void the contract as of January 16, 2019. Had Tradeshift accurately represented its capabilities, Smucker would never have entered into the Services Agreement.

## SMUCKER INCURRED SIGNIFICANT DAMAGES

60. As a result of Tradeshift's material misrepresentations and fraud, Smucker entered into the Services Agreement and, because Tradeshift proved incapable of performing its obligations, incurred and continues to incur significant damages.

61. To date, Smucker has paid Tradeshift $850,217.52, and there is an additional $232,410.91 in outstanding invoices. Smucker was also forced to incur hundreds of thousands of dollars in selecting a vendor to replace Tradeshift and to integrate a new product into Smucker's

system.

## COUNT I
## FRAUDULENT INDUCEMENT

62. Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

63. As set forth above and reflected in correspondence between the parties, in responding to Smucker's RFP and BRD, Tradeshift misrepresented material facts about its capabilities and the functionality of the product it could deliver to Smucker.

64. In the RFP that Tradeshift sent to Smucker on March 2, 2019, the misrepresentations are numerous, including, but not limited to, the financial stability of Tradeshift, its experience with similar companies and projects, its superiority to competitor products, and the functionality of its software including that its system provided real-time integration with Oracle and could "hide" the overall value of a PO.

65. In the BRD that Tradeshift sent to Smucker on June 14, 2019, the misrepresentations were also numerous, including, but not limited to, (1) the ability to have one to many supplier site relationships; (2) the ability for a user to 'hide' the overall PO value on a PO communication to the supplier, (3) the ability to integrate supplier master data from Oracle in an automated manner; (4) the ability to setup various approval routing rules (at entry of invoice); (5) the ability to setup reconciliation routing rules; (6) the ability to customize the entry form; (7) the ability for all master data to be real-time; and (8) the ability to enter a credit memo for returns.

66. If Tradeshift had responded truthfully and with full and complete disclosures, including the limitations of its product's capabilities, Tradeshift's submission to the BRD would have revealed that it was incapable of meeting many of Smucker's "Want" and "Must Have" requirements.

67. Smucker did not know or have reason to know that Tradeshift's submissions contained material misrepresentations and instead relied on Tradeshift's responses in evaluating the RFP and BRD and selecting Tradeshift as its vendor.

68. Tradeshift knew or should have known that many of its statements in the RFP and BRD were false, misleading, and/or incomplete, or it knew or should have known that it was misrepresenting information that was material to the RFP and BRD.

69. Alternatively, Tradeshift acted with utter disregard for the truth of its statements.

70. Tradeshift intended for Smucker to reply upon its responses to the RFP and BRD and Smucker reasonably relied on those responses.

71. Smucker was injured because, but for Tradeshift's false and misleading representations, Smucker would not have selected Tradeshift as its vendor or entered into the Services Agreement.

72. Smucker is entitled to rescission of the Services Agreement, compensatory damages, and punitive damages in an amount sufficient to punish and deter Tradeshift from engaging in similar fraudulent behavior in the future.

## COUNT II
## FRAUDULENT MISREPRESENTATION

73. Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

74. Tradeshift made misrepresentations of material fact before the execution of the Services Agreement, as described above, as well as misrepresentations following the execution of the Services Agreement, including representations regarding its financial stability, that its product was superior to that of competitors, the capabilities of its product, and representations of active relationships with customers of a similar size and scope, as stated above and throughout this

Complaint.

75. Smucker entered into the Services Agreement relying on Tradeshift's responses to the RFP and BRD.

76. After executing the Services Agreement, Tradeshift continued to misrepresent material facts respecting its ability to perform its obligations under the Agreement.

77. Tradeshift's representations were false when made, and Tradeshift acted intentionally, recklessly, willfully, and/or maliciously in making them.

78. Tradeshift knew, or should have known, that its representations were false, and it intended or knew that Smucker would rely on those representations to its detriment.

79. Smucker justifiably relied on these misrepresentations in evaluating Tradeshift's responses to the RFP and BRD, and in entering the Services Agreement and continuing to do business with Tradeshift.

80. Smucker suffered damage and injury as a direct and proximate result of its reliance on Tradeshift's material misrepresentations. As a result, Smucker is entitled to compensatory and punitive damages.

## COUNT III
## NEGLIGENT MISREPRESENTATION

81. Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

82. As described in detail above, Tradeshift misrepresented the functionality and performance of its product and the suitability of its system and features for a complex operation like Smucker.

83. The information communicated to Smucker was false and misleading.

84. Tradeshift failed to exercise reasonable care in communicating the information.

85. Smucker justifiably relied on the information provided by Tradeshift in deciding to select Tradeshift as its vendor for the project and enter into the Services Agreement.

86. Smucker suffered damage and injury as a direct and proximate result of its reliance on the false information provided by Tradeshift.

## COUNT IV
## BREACH OF CONTRACT

87. Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

88. For all the reasons stated above, Tradeshift committed a material breach of the Services Agreement that cannot be remedied.

89. Thus, Smucker is entitled to receive all sums paid to Tradeshift under the Services Agreement.

## PRAYER FOR RELIEF

Plaintiff The J. M. Smucker Company prays for judgment in its favor and against Tradeshift, Inc. for damages for fraudulent inducement, fraudulent and/or negligent misrepresentation, and breach of contract, pre- and post-judgment interest, punitive damages, costs, and such further relief to which Plaintiff may be entitled.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

/s/ *Ronie M. Schmelz*
Ronie M. Schmelz (5026158)
TUCKER ELLIS LLP
950 Main Avenue
Suite 1100
Cleveland, OH 44113
Telephone:   216.592.5000
Facsimile:   216.592.5009
E-mail:   ronie.schmelz@tuckerellis.com

*Attorney for Plaintiff The J.M. Smucker Company*